UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| AMEER KRASS, a/k/a AMEER HAROUN, | |
| Plaintiff, | |
| v. | CIVIL ACTION NO. 1:19-CV-5785-JPB |
| OBSTACLE RACING MEDIA, LLC, d/b/a OBSTACLERACINGMEDIA.COM and MATTHEW B. DAVIS, | |
| Defendants. | |

## ORDER

This matter comes before the Court on Obstacle Racing Media, LLC,

("ORM") and Matthew Davis's (together, "Defendants") Renewed Motion for

Summary Judgment [Doc. 110] and Defendants' Request for Oral Argument on

Motion for Summary Judgment [Doc. 113]. This Court finds as follows:

## I.   PROCEDURAL HISTORY

This case involves allegations that Defendants published two articles in 2019

on the ORM website that contained false and defamatory statements about Ameer

Krass ("Plaintiff"). Plaintiff filed this action on December 23, 2019, bringing the

following claims against Defendants: (1) defamation and defamation per se, (2)

false light invasion of privacy, (3) public disclosure of private facts and (4) tortious interference with current and prospective business relationships.[1]  [Doc. 1].

On April 15, 2020, Defendants moved to dismiss the case for failure to state a claim.  [Doc. 15].  On June 1, 2020, Defendants filed a motion for oral argument on the motion to dismiss.  [Doc. 28].  The Court granted the motion for oral argument on October 6, 2020, and held oral argument on December 4, 2020.[2]  See [Doc. 36].  On February 2, 2021, the Court denied Defendants' motion to dismiss.  [Doc. 39].  Defendants filed the instant Renewed Motion for Summary Judgment on August 8, 2022, seeking summary judgment on all of Plaintiff's claims.[3]  [Doc. 110].

---

[1] Plaintiff has abandoned his claim for tortious interference with business relations.  [Doc. 111-1, p. 72].  The Court will not discuss it further.

[2] Having already heard oral argument in this matter, the Court does not believe that oral argument is necessary a second time.  Defendants' Request for Oral Argument on the Motion for Summary Judgment is therefore **DENIED**.

[3] The Court previously denied without prejudice Defendants' motion for summary judgment for failure to comply with the Local Rules.  [Doc. 109].  While Defendants complied with the Local Rules in their renewed briefing, Plaintiff did not.  The response to the Motion for Summary Judgment is not double-spaced, such that if it were properly formatted, it would likely exceed the page limits.  See N.D. Ga. Civ. R. 5.1(C).  The response also incorporates by reference substantial sections of Plaintiff's statement of material facts—further aggravating the noncompliance with the page limits—and largely relies on those sections to support Plaintiff's arguments.  See, e.g., [Doc. 111, p. 3] (incorporating by reference seven pages); id. at 4 (incorporating by reference over twelve pages).  Defendants also incorporated by reference their statement of facts in their initial brief, see [Doc. 110-1, p. 10], but unlike Plaintiff, did not refer the Court to large portions

## II.    FACTUAL HISTORY

The Court derives the facts of this case from the following documents:  (1) Defendants' Statement of Undisputed Material Facts, [Doc. 110-21]; (2) Plaintiff's Response in Opposition and Objection to Defendants' Statement of Material Facts, [Doc. 111-1]; (3) Plaintiff's Statement of Material Facts in Dispute, [Doc. 111-70]; and (4) Defendants' Response and Objections to Plaintiff's Statement of Material Facts in Dispute, [Doc. 112-1].

The Local Rules of this Court require a respondent to a summary judgment motion to include with its responsive brief "[a] response to the movant's statement of undisputed facts."  N.D. Ga. Civ. R. 56.1(B)(2)(a).  Responses to the movant's facts must be concise and nonargumentative.  N.D. Ga. Civ. R. 56.1(B)(2)(a)(1).

---

of those facts as the primary bases for their arguments.  Moreover, Plaintiff's briefing suffers from some of the same issues that prompted the Court to require the parties to refile this matter.  For instance, Plaintiff's response to just one of Defendant's facts spans three pages.  See [Doc. 111-1, pp. 57–59]; see also id. at 60–62.  The Local Rules require *concise* responses to facts on summary judgment.  N.D. Ga. Civ. R. 56.1(B)(2)(a)(1).  Furthermore, many of Plaintiff's asserted facts were stated as legal conclusions, which is prohibited by the Local Rules.  N.D. Ga. Civ. R. 56.1(B)(1).  Moreover, as noted below, these were not the only issues with Plaintiff's filings.  See infra notes 6, 9.  Although the Court has discretion to decline to consider any motion or brief that fails to comply with the Local Rules, see N.D. Ga. Civ. R. 7.1(F), the Court considered Plaintiff's papers nonetheless.  The parties are reminded once more of their obligation to comply with the Local Rules of this Court.

The Local Rules make clear that the Court will deem each of the movant's facts

admitted unless the respondent

> (i) directly refutes the movant's fact with concise responses
> supported by specific citations to evidence (including page or
> paragraph number); (ii) states a valid objection to the
> admissibility of the movant's fact; or (iii) points out that the
> movant's citation does not support the movant's fact or that the
> movant's fact is not material or otherwise has failed to comply
> with the provisions set out in [Local Rule] 56.1(B)(1).

N.D. Ga. Civ. R. (B)(2)(a)(2).  Further, in accordance with the Local Rules, this

Court will not consider unsupported facts.  The Court will, however, use its

discretion to consider all facts the Court deems material after reviewing the

record.  For the purpose of adjudicating the instant Motions, the facts of this case

are as follows, divided into these sections:  (A) Introduction; (B) Spartan 4-0

Facebook Group; (C) Plaintiff's Conduct with Women in Spartan 4-0; (D)

Discussions in Spartan 4-0 and Moderation of Spartan 4-0 Content; and (E) the

First and Second Articles.

### A.    Introduction

Davis owns and operates the website onlineracingmedia.com, where he

publishes news and information about the sport of Obstacle Course Racing

("OCR").  [Doc. 111-1, p. 1].  Davis is not a professional journalist; he is a

"content creator" for OCR.  [Doc. 112-3, p. 37].  Spartan Race, Inc. ("Spartan") is

the largest company in the OCR industry worldwide.  [Doc. 111-1, p. 3].  Plaintiff,

who lives in New Jersey with his wife and two daughters, became involved in

OCR in 2015.  Id. at 2.  Plaintiff has been separated from his wife at various times,

including in 2015 and 2016.  [Doc. 112-1, p. 22].

Davis published two articles on the ORM website that featured Plaintiff and

that are now at the center of this lawsuit.  On October 21, 2019, Davis published an

article titled "#MeToo Hits OCR"; this is the "First Article."  [Doc. 111-1, p. 1];

see also [Doc. 1-1, pp. 2–11] (the First Article).  Davis published an article titled

"Spartan Race Bans Ameer Haroun" on October 22, 2019; this is the "Second

Article."  [Doc. 111-1, p. 2]; see also [Doc. 1-3, pp. 2–8] (the Second Article).  The

First Article contain allegations from six women—J.C., A.D., T.A.S., A.C., J.H.

and K.C.—about Plaintiff's conduct.  In the Complaint, Plaintiff alleges that

Defendants knowingly and intentionally published false and defamatory statements

in the First Article.[4]  See [Doc. 1, pp. 8–19].  The Court will discuss the facts

_____

[4] While the Complaint enumerated allegedly defamatory and false statements from the
First Article, it did not do the same for the Second Article.  See [Doc. 1].  The Complaint
expressly premised the defamation claim on a list of "false, defamatory, and damaging
statements in the First Article."  Id. at 8.  Those statements are presented in full in section
II.E.2, see infra.  The Complaint does not premise the defamation claim on any
statements in the Second Article.  In his statement of material facts, Plaintiff alleges that
certain statements in the Second Article are false.  See, e.g., [Doc. 112-1, p. 77].  First,
the Local Rules do not permit the assertion of facts stated as issues or legal conclusions.
N.D. Ga. Civ. R. 56.1(B)(1).  Second, a plaintiff may not amend his complaint in

relevant to this case and to these articles before setting forth the allegedly defamatory statements.

### B.    Spartan 4-0 Facebook Group

Spartan operates several Facebook groups comprised of Spartan OCR participants with shared characteristics, such as geography.  [Doc. 111-1, p. 4]. Other Facebook groups are similarly comprised of Spartan OCR participants but are not formally operated by the company.  Id.  One such group is Spartan 4-0.  Its creation, administrators and members are relevant to this case and are discussed below.

### 1.    Creation of Spartan 4-0

J.C. and A.D. are two women who were involved in OCR and who were members of a Facebook group called "Spartans of the Northeast."  Id. at 5.  In 2015, A.D. posted in Spartans of the Northeast about participating in OCR after the age of forty.  Id.  J.C. commented on that post and explained that she planned to start a Facebook group for OCR participants over the age of forty.  Id.  J.C. created a Facebook group on October 2, 2015, and named it "Spartan 4-0."  Id. at 6; [Doc.

---

response to a motion for summary judgment.  Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004).  The Court therefore declines to consider the new allegations in Plaintiff's statement of material facts regarding any purportedly false or defamatory statements in the Second Article.

112-1, p. 2].  She added A.D. and Plaintiff as administrators of the group.  [Doc.

111-1, p. 6].  Spartan 4-0 gained at least a thousand members within its first few

months.  Id.  Davis joined Spartan 4-0 after it was formed and was a member of the

group at least as early as December 2015.  [Doc. 112-1, p. 21].

### 2.      Trademark Discussions

On October 19, 2015, J.C. raised to Plaintiff and A.D. in a Facebook

Messenger thread the idea of trademarking the name "Spartan 4-0."  [Doc. 111-1,

p. 6].  A.D. responded that she agreed with the proposal, and Plaintiff responded

"Good idea.  Will we need a company?"  [Doc. 110-6, p. 82].  Plaintiff, J.C. and

A.D. then discussed logistics about creating a business entity and registering a

trademark for the group.  Id. at 89–93.

In the course of that conversation, Plaintiff asked who would own the

trademark.  Id. at 91.  J.C. responded that she thought she would own the

trademark since she named the group but clarified that if A.D. or Plaintiff

disagreed, she was "totally open" and that they could discuss the issue.  Id.

Plaintiff said that J.C. was "[n]ot starting this on the right foot."  Id.  Plaintiff

explained that he expected that ownership of the trademark would be divided

equally among himself, J.C. and A.D.  Id.  J.C. stated she was open to that idea.

Id. at 91–92.  J.C. later said that she was "comfortable with trademarking the name

first and then taking the next steps." Id. at 93.  Plaintiff responded with these

messages:

> Please tell me you read what I wrote[.]
>
> That upset me a little and it takes a lot to get me upset[.]
>
> [A.D.] & [J.C.] if you choose to take steps in that regard
> without us agreeing on them first it would be a sign of what is
> to come and I would want non[e] of that.

Id. at 93–94.  After the three individuals discussed scheduling a phone call to

continue the conversation, Plaintiff sent the following messages:

> In the [meantime] if you proceed individually with any steps
> without us agreeing on them I'll be concerned.  The brand
> Spartan 4-0 is about the spirit and if that spirit is gone that
> brand won't stand for much[.]
>
> Sorry ladies I like to work with people who respect me [in] the
> same way I respect them.  I'm surprised[.]

Id. at 95.  J.C. responded that she would prefer to talk on the phone because she

felt that "this [was] getting uncomfortable."  Id.  Plaintiff agreed and asked J.C.

and A.D. when they were available to talk.  Id.  At that point, J.C. sent the

following message:  "I am so sorry guys but I cannot do this.  I feel like I am being

bullied.  I am going to leave the group.  [IT'S] ALL YOURS AMEER.  I am

done."  Id. at 95–96; see also [Doc. 111-1, p. 9].

The parties dispute whether Plaintiff and J.C. ever discussed the trademark

issue anywhere other than on Facebook Messenger.  [Doc. 111-1, pp. 8–9].

Defendants argue that Plaintiff texted with J.C. about the trademark dispute.  To support their position, Defendants point to a declaration submitted by J.C., in which she stated that Plaintiff "sent [her] text messages telling [her] that if [she] moved forward with the trademark without him, [she] would regret it."  [Doc. 110-5, p. 6].  J.C. "understood that to be a threat."  Id.  J.C. further declared that she "actually [felt] unsafe due to the tone of his messages and how upset he seemed to be getting" and that she "worried for [her] safety and [her] family's safety."  Id.  Plaintiff admits that he texted with J.C. and that he no longer has all of those text messages, but Plaintiff denies ever texting with J.C. about the trademark dispute and specifically denies ever sending her a threatening message.  [Doc. 111-1, pp. 8–9].

### 3.    J.C.'s and A.D.'s Departures from Spartan 4-0

J.C. subsequently left Spartan 4-0 and blocked Plaintiff on Facebook.  Id. at 10.  In her declaration, J.C. averred that she left Spartan 4-0 because of Plaintiff's behavior, which she described as "hostile and aggressive."  [Doc. 110-5, p. 6].  At some point, A.D. left Spartan 4.0 as well.  Id. at 12.  According to a declaration that she submitted, A.D. informed J.C. and Plaintiff that she was leaving the group because of her busy schedule, but "J.C. knew that [A.D.] was really leaving because [she] did not feel comfortable working on the group with [Plaintiff]."  Id.

Despite J.C.'s and A.D.'s departures, Spartan 4-0 continued to grow.  The administrators of Spartan 4-0, including Plaintiff, helped increase its membership from 1,000 members to over 15,000 members.  [Doc. 112-1, p. 20].  By 2019, Spartan 4-0 was the largest Facebook group for OCR enthusiasts that was not formally operated by Spartan.  [Doc. 111-1, p. 4].  Plaintiff remained an administrator of Spartan 4-0 and was the group's leader.[5]  Id. at 12.  Plaintiff testified that he was famous "[w]ithin Spartan 4-0."  [Doc. 110-2, p. 191].  Plaintiff was also the Spartan 4-0 point person within Spartan.  [Doc. 111-1, p. 14].

### C.    Plaintiff's Conduct with Women in Spartan 4-0

Plaintiff sought out romantic and sexual relationships with women in Spartan 4-0.  Id. at 20.  Plaintiff asked female members of Spartan 4-0 to send him sexual pictures of themselves, including of their sexual body parts,[6] and he sent

---

[5] When responding to this fact, Plaintiff objected to Defendants' use of Jonathan Fine as a witness and asked this Court to exclude or strike his testimony.  See [Doc. 111-1, p. 12].  Fine's testimony is not necessary to support this fact; Plaintiff admitted that he was the leader of Spartan 4-0 in response to Defendants' request for admissions.  [Doc. 110-10, p. 26].  Nonetheless, the Court declined to consider Fine's testimony in the resolution of the instant Motion.

[6] In numerous instances, Plaintiff disputed Defendants' facts but failed to set forth a basis for the dispute that is permitted under the Local Rules.  See N.D. Ga. Civ. R. 56.1(B)(2)(a)(2).  This fact, for example, is a nearly word-for-word quotation of one of Defendants' requests for admissions, which Plaintiff admitted without reservation.  See [Doc. 110-10, p. 32].  Plaintiff, however, disputed the fact by asserting that he did not send *unsolicited* sexual pictures or request such pictures from *random* female group members.  [Doc. 111-1, p. 20].  Defendants' fact did not make any statement about

female members of Spartan 4-0 sexual pictures of himself, including of his sexual body parts.  Id.  Plaintiff sent sexual text messages to female members of Spartan 4-0, which sometimes included shirtless photographs of Plaintiff, and had sexual telephone calls with female members of Spartan 4-0.  Id. at 20–21.  Plaintiff had flirtatious or sexual relationships with at least twelve women in Spartan 4-0.  Id. at 21.  Plaintiff acknowledged that there were more women in Spartan 4-0 with whom he had a flirtatious relationship, but he declined to name them.  Id.

The First Article includes allegations about Plaintiff's conduct from six women.  Two, J.C. and A.D., were discussed previously.  See supra section II.B. The remaining four women and their respective interactions with Plaintiff are discussed below.

### 1.    Interactions with T.A.S.

Around November 2015, T.A.S., a former member of Spartan 4-0, and Plaintiff began a flirtatious relationship on Facebook Messenger, and they continued to correspond via text message and phone calls.  [Doc. 111-1, p. 34]; see also [Doc. 110-12, p. 2].  Their flirtatious conversations progressed to discussing

---

unsolicited pictures or random group members, and a response premised on these grounds is baseless.  Because this kind of response fails to comply with the Local Rules, see N.D. Ga. 56.1(B)(2)(a)(2), the Court disregards it (and others like it) and deems the fact admitted.

sex and their mutual desire for one another.  [Doc. 112-1, p. 38].  Plaintiff

occasionally called T.A.S. while she was at work.  [Doc. 111-1, p. 34].  T.A.S.

testified that during those calls, Plaintiff talked to her about things he wanted to do

to her sexually.  Id.  Plaintiff invited T.A.S. to fly to New Jersey to see him and

offered to reimburse her for the cost of a hotel stay.  Id.  While Plaintiff and T.A.S.

were engaged in sexual flirtations, Plaintiff was also having sexual encounters and

sexual communications with other women.  Id. at 35.  T.A.S. eventually learned

about these other encounters and subsequently ended her relationship with

Plaintiff.[7]  Id.

　　Davis and T.A.S. were founding members of a Facebook group called

"Kicked Out from 4-0 Spartan," which was created at some time in 2016.  [Doc.

112-1, p. 34].  On June 7, 2017, T.A.S. posted in that group and said that Plaintiff's

requests for nude photos of her "became a daily thing with him, and it became

increasingly uncomfortable" and that she "voiced it to him" but "[n]aturally, he

didn't care."  [Doc. 111-1, p. 29].  T.A.S. also stated in that post that Plaintiff

would call her at work, talk to her about things he wanted to do to her sexually and

---

[7] Plaintiff disputes this fact and argues that he ended the relationship because T.A.S. kept
cancelling her visits to New Jersey.  Plaintiff, however, supported this assertion with  a
citation to a series of Facebook messages.  See [Doc. 111-28, pp. 25–32].  It is unclear to
the Court how these messages support Plaintiff's assertion or how they contradict
T.A.S.'s declaration, on which Defendants rely to support this fact.

become angry when she informed him that she wanted nothing to do with the conversations.[8]  Id.  Another former member of Spartan 4-0, K.C., responded to T.A.S.'s post.  Id.  She stated that she had an encounter with Plaintiff that "was physically abusive"; that he "didn't listen when [she] said no"; and that he "hit her" in the face."  Id.  Plaintiff's interactions with K.C. are discussed in additional detail below.  See supra section II.C.4.

## 2. Interactions with A.C.

A.C. is a woman who was involved in OCR and was a member of Spartan 4-0.  [Doc. 111-1, p. 36].  After she joined Spartan 4-0, she and Plaintiff began communicating via Facebook Messenger.  Id.  Plaintiff was flirtatious toward A.C., and she reciprocated these flirtations.  Id. at 36–37.  Plaintiff and A.C. went to dinner at one point, and after dinner, Plaintiff drove A.C. home and came inside her house.  Id. at 37.  Plaintiff and A.C. do not recall the details of this particular evening in the same manner.  Plaintiff testified that A.C. invited him into her house.  [Doc. 111-2, p. 33].  A.C., on the other hand, submitted a declaration in which she stated that she "did not invite [Plaintiff] into the house, nor did he ask if he could come in."  [Doc. 110-8, p. 7].  Instead, according to A.C., Plaintiff

---

[8] Plaintiff denies that he ever became angry when T.A.S. did not want to engage in a sexual conversation.  [Doc. 111-57, pp. 16–17].

"walked past [her] to enter the house" when she opened the door.  Id.  In her

declaration, A.C. averred that once inside her house, Plaintiff attempted to kiss her.

Id. at 8.  Plaintiff contends that the kiss was mutual.  [Doc. 110-2, pp. 203–04].  He

testified, however, that "[i]t felt to [him] that [A.C.] felt that [they] were moving

too fast."  Id. at 204.  The record is clear that at some point, A.C. asked Plaintiff to

leave her house, and he complied.  [Doc. 111-1, p. 37].

　　After leaving, Plaintiff called A.C. and asked if he could return to sleep at

her house.  Id.  A.C. said no, and she recalls repeatedly telling Plaintiff that he

could not sleep at her house.  Id. at 38.  Plaintiff does not remember how many

times A.C. told him "no."  Id.  After their date, Plaintiff sent A.C. a message

saying, "[s]orry you felt rushed for sex."  Id.

### 3.    Interactions with J.H.

　　J.H. was a member of Spartan 4-0 and met Plaintiff through that group.  Id.

at 39.  J.H. and Plaintiff exchanged messages on Facebook Messenger beginning at

least in October 2015.  [Doc. 110-16, p. 2].  Some of Plaintiff's messages to J.H.

included sexually explicit language.  [Doc. 111-1, p. 39].  J.H.'s messages to

Plaintiff, in contrast, did not.  See [Doc. 110-16, pp. 2–24].

　　In 2017, J.H. participated in a Spartan race event in Bermuda.  [Doc. 111-1,

p. 40].  Plaintiff also attended this event along with his wife.  Id.  According to

Plaintiff, he and his wife were attempting to reconcile and work on their marriage during this time.  Id. at 41.  J.H. and Plaintiff met while in Bermuda and had an encounter after the race.  Id.  They have different recollections of how this encounter unfolded.  The parties agree generally that J.H. and Plaintiff ended up behind a wall, where they kissed and felt each other's bodies.  Id.

J.H. submitted a declaration in which she averred that after the race, Plaintiff "pulled [her] behind a concrete wall."  [Doc. 110-9, p. 3].  J.H. stated that Plaintiff "shov[ed] his hand down [her] pants" and that "he took [her] hand and placed it on his penis, on the outside of her pants."  Id. at 3–4.  J.H. declared that she "pulled away to try to make [Plaintiff] stop and to distance [herself] from him" but that Plaintiff "seemed unphased."  Id. at 4.  According to J.H., she was "shocked" by Plaintiff's conduct.  Id.

Plaintiff testified that he did not "pull" J.H. behind the wall.  [Doc. 112-1, p. 48]; see also [Doc. 93-7, pp. 33–36].  Plaintiff does not recall where he touched J.H. or if he put his hand down her pants.  [Doc. 112-1, p. 48].  Plaintiff did not know where his wife was when he was behind the wall with J.H., but she ran the race with him and was present at the race grounds.  Id.

Plaintiff contends that a subsequent interaction with J.H.—which is not referenced in the First Article—is material to the instant case; Defendants disagree.

In short, Plaintiff, J.H. and Plaintiff's wife were in a hot tub at the hotel later that day.  Id. at 49.  J.H. was seated in between Plaintiff and his wife.  Id.  While the three individuals were conversing, Plaintiff attempted to digitally penetrate J.H. under the water.  Id.  In her declaration, J.H. testified that she was "again shocked by [Plaintiff's] inappropriate conduct" and that it "made [her] very angry."  [Doc. 110-9, p. 4].  J.H. averred that she "immediately pulled away" and changed her seating position in the hot tub.  Id.  Plaintiff's wife, however, submitted a declaration in which she stated that "[a]t no point did J.H. pull away from [Plaintiff] or indicate that she was uncomfortable with anything."  [Doc. 111-36, p. 5].

### 4.     Interactions with K.C.

K.C., a member of Spartan 4-0, met Plaintiff in November 2015, and they became romantically involved within two weeks of meeting.  [Doc. 111-1, p. 43]; [Doc. 112-1, p. 22].  K.C. and Plaintiff began to exchange messages via text and Facebook Messenger, some of which were of a sexual nature.  [Doc. 111-1, p. 43].  K.C. felt that Plaintiff was possibly interested in having a romantic relationship with her.  Id.

Plaintiff and K.C. made plans to meet at a hotel room.  Id.  Before this meeting, K.C. and Plaintiff exchanged messages on Facebook about their planned

encounter.  [Doc. 112-1, p. 22].  Among others, they exchanged the following

messages:

| | |
|---|---|
| Plaintiff: | I may pull your hair in the process<br>And slap your ass<br>But then kiss you |
| K.C.: | Sounds good to me!<br>Pull and slap as hard as u like.  I like it rough[.] |

[Doc. 111-14, p. 53].

On November 23, 2015, K.C. and Plaintiff met at a hotel in Brunswick, New

Jersey.  [Doc. 111-1, p. 43]; [Doc. 112-1, p. 23].  Plaintiff brought wine to the

room; he kissed K.C. while he had wine in his mouth, and some of the wine

entered her mouth.  [Doc. 111-1, p. 44].  K.C. expected that she and Plaintiff

would possibly have sex.  Id.

The details of what happened between Plaintiff and K.C. in the hotel room

are disputed, but the parties agree that Plaintiff and K.C. ultimately had sex twice.

[Doc. 112-1, p. 23].  The parties also agree that, at some point, Plaintiff's penis

was in K.C.'s mouth.  Defendants contend that Plaintiff put his penis in K.C.'s

mouth.  [Doc. 111-1, p. 45].  K.C. submitted a declaration in which she stated that

Plaintiff "grabbed the back of [her] head by [her] hair and forced [her] into giving

[him] oral sex" and that he "was forcibly moving [her] head back and forth on his

penis."  [Doc. 110-13, p. 93].  K.C. stated that Plaintiff was "aggressive," which

made her "feel uneasy."  Id.  K.C. also stated that Plaintiff slapped her, spanked her and pulled her hair.  [Doc. 111-1, p. 45].

Plaintiff admitted putting his penis in K.C.'s mouth.[9]  See [Doc. 110-10, p. 37].  He characterizes the interaction with K.C. as one of reciprocity, consent and mutual interest, arguing that they both placed his penis in her mouth and that K.C. never indicated a lack of interest in performing oral sex.  See [Doc. 111-1, p. 45]. Nevertheless, it is undisputed that Plaintiff put his hand on the back of K.C.'s head while his penis was in her mouth; that he does not remember whether he pushed her head toward his genital area; and that he spanked her and pulled her hair.  Id. Plaintiff does not remember whether he was smiling when his penis was in K.C.'s mouth.  Id.  Plaintiff testified that he did not slap K.C. in the face.  [Doc. 111-2, pp. 68–69].

---

[9] Here and in numerous other instances, Plaintiff disputed a fact that he unequivocally admitted in response to Defendants' requests for admissions.  An admission "is conclusively established" unless the Court, following a motion, "permits the admission to be withdrawn or amended."  Fed. R. Civ. P. 36(b).  Plaintiff has not sought to amend or withdraw any of the admissions at issue here, and the Court may rely on admissions when deciding a motion for summary judgment.  Cf. Hicks v. Mercedes-Benz U.S. Int'l, Inc., 877 F. Supp. 2d 1161, 1170 (N.D. Ala. 2012) ("Unlike admissions, denials do not constitute 'materials in the record' that can be relied on in making or responding to a motion for summary judgment." (quoting Fed. R. Civ. P. 56(c)(1)(A))).

K.C. and Plaintiff fell asleep.  [Doc. 111-1, p. 46].  Plaintiff eventually woke K.C. up and initiated another sexual encounter with her.  Id.  After this, Plaintiff and K.C. both dressed and left the hotel.  Id.

The parties dispute both the nature and significance of K.C. and Plaintiff's interactions following this encounter.  Plaintiff contends that K.C. began to "pressure" Plaintiff to be in a committed relationship, [Doc. 112-1, p. 25], and testified that K.C. was "obsessed," [Doc. 111-2, p. 76].  Plaintiff's position seems to be that K.C.'s actions after the hotel room incident cast doubt on the veracity of her account.  Defendants contend that these facts are not material.  In the interest of presenting the facts of this case thoroughly, the Court discusses Plaintiff and K.C.'s communications following the hotel room incident.

The record contains the following messages between Plaintiff and K.C., exchanged on November 25, 2015:

|  |  |
|---|---|
| K.C.: | How long will the silent treatment continue |
| Plaintiff: | Good morning [K.C.].  No silent treatment really.  Just thoroughly thinking about this.  Thank you for tagging me on the silly Guy's spider post. |
| K.C.: | You['re] welcome… You know, I'm the same person I was before.  Why can't you talk to me about this? |
| Plaintiff: | Because this is a decision I'm gonna stick to.  It's not just a date, it's a relationship…  Something we should each figure out individually if we want it |

> K.C.:        We went from talking 30 times a day to nothing…
>             Not really nice…  Do you think?  From my
>             perspective ur not interested…  If u were, we
>             would be talking.  I'll cancel the hotel for this
>             weekend as its clear we [won't] be spending any
>             time together
>
>             Decision made [i]ndividually?  No, if I was
>             deciding if I wanted to be with someone, I'd talk to
>             them.  I feel pretty used and very stupid.  No
>             blame on you…  I should have cancelled the room
>             like I wanted[.]

[Doc. 111-14, pp. 70–71] (ellipses in original).  The conversation continues:

> Plaintiff:   Please think about this slowly and carefully.  For
>             all the different reasons the gal I liked talking to
>             was different than the gal I met.  Doesn't make one
>             better or worse.  Regardless of [whose] fault it is
>             still that's where we are.  I am thinking of should I
>             go out wit[h] you again to try and remove the
>             layers and see if there is the girl I like under there
>             or save us both the aggravation and step away
>             from a relationship while staying a friend (if you
>             would take me as one)
>
> K.C.:        But don't try to make me think you cared or care.
>             You took advantage of a situation.  You made a
>             promise u didn't keep and you put nothing but
>             [p]ressure on me in that room.  You slapped me in
>             the face and then decided not to talk to me
>
> Plaintiff:   Please stop!  I do care!  You are making it sound
>             like I am a devious user and I am not.
>
> K.C.:        I wanted to see you and spend time with you
>             soooooo much it made me crazy.  But how u were
>             in that room was not caring or sincere and it wasn't
>             passionate.  It was aggressive and not so nice and
>             definitely didn't show me u cared.

Id. at 72–73.  Plaintiff expressed to K.C. that he did not want her talking to others about their sexual encounter.  [Doc. 111-1, p. 48].  K.C. did not report her allegations to the police.  [Doc. 112-1, p. 29].

> **D.**   **Discussions in Spartan 4-0 and Moderation of Spartan 4-0 Content**

In late 2015, some women in Spartan 4-0, including K.C., began making posts and leaving comments in the group about Plaintiff's sexual conduct.  [Doc. 111-1, p. 22].  K.C. submitted a declaration in which she averred that her post garnered "a lot of responses" and "was seen and talked about after the fact very quickly," although her post was ultimately deleted.  [Doc. 110-13, p. 94].

Although the record is not entirely clear, it appears that Plaintiff deleted at least one post by K.C.  In December 2015, Plaintiff and Danielle Reinhardt, one of the Spartan 4-0 administrators, exchanged a number of Facebook messages in which they discussed the increasing number of posts about Plaintiff's conduct toward women.  [Doc. 110-4, pp. 150–218].  In the course of that exchange, Plaintiff called K.C. a "psycho," and Reinhardt asked Plaintiff why he deleted one of K.C.'s posts and what the post had said.  [Doc. 111-1, p. 22]; [Doc. 110-4, pp. 167–68].  Plaintiff does not appear to provide an explanation in that exchange.  Id.

The administrators of Spartan 4-0 deliberated at length how to handle the accusations against Plaintiff, particularly as the accusations became a topic of

discussion in Spartan 4-0.[10]  See [Doc. 110-7].  One administrator, Rihana,[11] began

the conversation by saying, "Ameer:  innocent until proven guilty.  I am 100% for

that" and stating that Plaintiff "need[s] due process.  And the women who are

saying this need to be heard and not dismissed."  Id. at 21.  A few messages later,

Reinhardt wrote that she did not "understand why [Plaintiff] is being attacked."  Id.

at 22.  Rihana responded that "there are very strong allegations circulating about

[Plaintiff]" that "are very, very serious and cannot be taken lightly."  Id.  The

administrators discussed the different allegations levied against Plaintiff, including

sending unsolicited pictures and "an allegation of violence."  Id. at 23.  Rihana

noted that "anything that happens between two consenting adults is irrelevant to

this conversation" but that unsolicited sexual images "and the allegation of

slapping [somebody] and forcing sex is serious."  Id. at 25.  Reinhardt later notes

that she has "contacted numerous women" and "[a]ll have been consensual."  Id. at

---

[10] Defendants reference portions of this discussion in their statement of undisputed
material facts.  Plaintiff objected and argued that other portions of the conversation
should be referenced in fairness, citing Rule 106 of the Federal Rules of Evidence.  See,
e.g., [Doc. 111-1, p. 23]; see also Fed. R. Evid. 106 ("If a party introduces all or part of a
writing or recorded statement, an adverse party may require the introduction, at that time,
of any other part—or any other writing or recorded statement—that in fairness ought to
be considered at the same time.").  The Court has reviewed the 130-page exhibit in its
entirety and references herein the portions that are relevant and material for the
adjudication of the instant Motion.

[11] Rihana's surname does not appear in the record.

58.  Rihana states that "just as much as [Plaintiff] has to be accountable – the women have to be accountable if they are spreading lies." Id. at 79.  Plaintiff offered to share "evidence that it was consensual" with respect to "any girl" and sent various screenshots during the conversation. Id. at 63.  One of the administrators ultimately responded that he "asked for proof and [Plaintiff] provided enough." Id. at 104.

In the course of this discussion, other administrators refer to Plaintiff as "the face of the group" and the "group leader." Id. at 50, 55.  Rihana stated that Plaintiff "has positioned himself as an 'authority figure' and that comes with the responsibility of not exploiting that power to fish for women." Id. at 80–81.  She later messaged that Plaintiff was "the reason" people came to Spartan 4-0 and was "now the reason they are leaving" and that "[p]eople are leaving in droves." Id. at 109, 112.  Another member of the chat stated, "[l]et's ALL drop it[,] move on and save this amazing community." Id. at 113.

The administrators of Spartan 4-0 ultimately looked into the allegations against Plaintiff.  [Doc. 112-1, p. 32].  Plaintiff claims that the administrators "cleared" him of all allegations. Id.  It appears that Reinhardt and Rihana created a Facebook Messenger chat with some of the women who had accused Plaintiff of improper conduct.  [Doc. 110-7, p. 128].  Rihana sent the following message to the

other Spartan 4-0 administrators, including Plaintiff:  "All the people in the list have all said it was consensual – that's not news – they just said he's manipulative etc. but [K.C.] won't speak with [Reinhardt] in the group but stands by her allegations."  [Doc. 111-21, p. 110].  It is unclear from the record who the "people in the list" are, but it appears that the Facebook chat included five women other than K.C.  See [Doc. 110-7, pp. 118–19].  The five other women do not seem to be any of the women whose statements are at issue in this case.

Plaintiff subsequently posted an announcement in Spartan 4-0 stating that "these allegations are about me" and that he spent the prior day "sharing proof after proof with [his] fellow admins that these relationships were [consensual]."  [Doc. 111-22, p. 3].  Plaintiff also stated that "[i]t's unfair to bring someone's . . . personal life into this but if any of you have a friend that told them differently please message me and I'll show you proof."  Id.  In a May 10, 2016 post in Spartan 4-0, Plaintiff again publicly addressed the allegations against him ("that I sent unsolicited inappropriate pics (vs a mutual exchange), and one much more serious claim"), saying he was "being attacked" and "personally harmed."[12]  [Doc. 111-1, p. 27].

_____

[12] Plaintiff asserts that the allegations about his conduct were not a topic of discussion in Spartan 4-0 until Davis and the Kicked Out from 4-0 Spartan Facebook group began posting about the issue in 2016 and 2017.  [Doc. 112-1, p. 35].  Plaintiff supports this

The parties dispute Plaintiff's role in moderating certain content in Spartan 4-0, particularly content related to these allegations.  Defendants contend that Plaintiff actively removed comments and posts in Spartan 4-0 that referenced his behavior toward women and that he removed members from the group that interacted with this content.  See id. at 26–27.  Defendants direct the Court to Plaintiff's clear admission that he removed members of Spartan 4-0 after they posted or commented about Plaintiff's conduct toward women.  [Doc. 110-10, p. 31].  Plaintiff also admitted that he had a role in blocking members of Spartan 4-0 who did not comply with the group's guidelines or who otherwise behaved inappropriately.  Id. at 22–23.  Plaintiff, on the other hand, relies on his testimony that he "chose not to be the [administrator] acting on something" that had a "direct relationship to [him]" because he felt that "it would be the better way for an unbiased person . . . that's not involved directly in something" to handle those situations.  [Doc. 111-2, p. 32].

assertion with a declaration from Susanna Burger, but this declaration does not support his position that Davis or the Kicked Out group played a role in increasing discussion about these allegations.  The declaration says only that Davis "disliked" Plaintiff and would "try to start rumors periodically."  [Doc. 111-8, p 3].  Moreover, the record shows that the allegations about Plaintiff were a significant topic of discussion as early as December 2015, as evidenced by the lengthy conversation among the Spartan 4-0 administrators about how to handle the issue.  See [Doc. 110-7].  The Court, therefore, does not devote additional discussion to the Kicked Out group.

In May 2017, Davis posted in Spartan 4-0, commenting on how "this group is constantly talking about people who need to be kicked out or who have been kicked out." [Doc. 111-1, p. 28].  His post was deleted, so he posted it again; it was then deleted a second time.  Id.  Davis posted in the Spartans of the Northeast Facebook group to share that his post in Spartan 4-0 had been deleted.  Id.  Davis's post received many comments, including references to Plaintiff's sexual conduct. Id.

### E.    The First and Second Articles

As early as January 2016, Davis began receiving and hearing information about Plaintiff's conduct toward women within the OCR community.  Id. at 48. He also observed that negative posts about Plaintiff in Spartan 4-0 had been deleted.  Id. at 49.  Davis testified that he needed to do his "due diligence" and thus looked into the allegations about Plaintiff's conduct toward women for several years.  Id.; [Doc. 110-2, p. 17].  The Court reviews below Davis's interactions with the six women whose statements appear in the First Article before discussing the publication and content of the First and Second Articles.

### 1.    Davis's Research

Davis spoke to J.C. via Facebook Messenger in January 2016 and May 2017. [Doc. 111-1, p. 54].  Both times, J.C. informed Davis that Plaintiff had bullied her

and A.D., prompting them to leave Spartan 4-0.  Id.  J.C. stated that she did not

want to speak on the record because she was scared of Plaintiff and wanted to

move on with her life.  Id.  In October 2019, Davis contacted J.C. and asked if she

would come forward because other women were doing so.  Id. at 55.  J.C. agreed,

and she initiated a group chat with herself, Davis and A.D.  Id.  Davis, J.C. and

A.D. communicated through Facebook Messenger on October 16, 2019, and the

women confirmed their accounts of Plaintiff's conduct toward them.  Id.

Davis testified that when he first spoke with J.C. and A.D., he was

"disappointed" because they did not have "concrete proof" of their story (i.e.,

screenshots of their messages with Plaintiff).  [Doc. 111-13, p. 42].  At that time,

too, neither woman wanted to speak publicly because each feared personal

messages from Plaintiff.  Id. at 41.  Davis admits that the only thing that changed

between the time he learned that J.C. and A.D. did not have any of the messages

and the time he published the First Article was that both women agreed to come

forward with their stories.  [Doc. 112-1, pp. 60–61].  Prior to publishing the

articles, Davis did not ask Plaintiff if he would voluntarily share his messages with

A.D. and J.C.  [Doc. 111-13, p. 42].

Davis had been acquainted with T.A.S. since at least December 2015.  [Doc.

111-1, p. 55].  In November 2016, T.A.S. mentioned to Davis that she had negative

27

experiences with Plaintiff that were of a sexual nature.  Id.  Davis also read T.A.S.'s account of her experiences with Plaintiff in her 2017 post in the Kicked Out from 4-0 Spartan Facebook group.  Id. at 56.  In October 2019, Davis received T.A.S.'s permission to share her experiences with Plaintiff.  Id.  T.A.S. informed Davis, however, that she did not have the messages she exchanged with Plaintiff anymore. [Doc. 111-29, p. 3].

Davis communicated with K.C. in December 2018 via text message about her experience with Plaintiff and communicated with her again in August 2019. [Doc. 111-1, p. 57].  Davis stated to K.C. in December 2018 that "[o]ne person can always be he said, she said.  Two and people's belief goes up like 90 percent. . . . [W]hen we print this, it will be too big to[] ignore; and the walls will crumble." [Doc. 110-17, p. 25].  Davis was aware that K.C. posted her allegations publicly in Spartan 4-0, as well as in other OCR groups.  [Doc. 112-1, p. 55].  According to K.C., her boyfriend at the time of her encounter with Plaintiff did not believe her accusations.  Id. at 56.  Davis was aware that K.C.'s boyfriend did not believe her, but Davis did not question why this was the case.  Id.

K.C. informed Davis that she did not report her encounter with Plaintiff to the police because "[Plaintiff] is scary," no one believed her and individuals such as her boyfriend persuaded her not to, instead encouraging her to delete everything

and "move on."[13]  [Doc. 112-1, p. 29].  Davis testified that only K.C.'s allegations,

along with claims that Plaintiff sent unsolicited pictures, were not enough to write

an article, which is why he waited so long to write the First Article.  Id. at 54.

Davis was later sent the messages that Plaintiff and K.C. exchanged following the

hotel room encounter.  Id. at 59; see supra section II.C.4.  Davis testified that these

messages did not cast any doubt in his mind about whether K.C.'s allegations were

truthful.  [Doc. 111-13, p. 128].

Davis communicated with J.H. via Facebook Messenger on October 15,

2019, about her encounter with Plaintiff.  [Doc. 111-1, p. 57].  J.H. told Davis that

Plaintiff pulled her behind a cement wall, started trying to make out with her,

shoved his hand down her pants and put her hand on his penis outside his clothing.

[Doc. 111-38, p. 5].  After hearing about this incident, Davis told J.H. that once she

and K.C. came forward, he guaranteed that many others would come forward, too,

and that Spartan would have to do something.  [Doc. 111-13, pp. 73–74].  Davis

---

[13] It appears that K.C.'s boyfriend nonetheless reported her allegations to Spartan.  [Doc. 112-1, p. 29].  The initial email that K.C.'s boyfriend sent to Spartan does not appear to be in the record.  See [Doc. 111-18].  Presumably, though, he informed them about K.C.'s experience with Plaintiff.  Spartan responded that it "take[s] these matters very seriously" but that because "these allegations are criminal in nature," Spartan was "not in a position to evaluate without these allegations being corroborated."  Id. at 2.  K.C.'s boyfriend responded that he had spoken to the police, that "the females are too fearful to approach the police" and that he would continue to encourage them to speak with law enforcement.  Id.

also stated that he would be sure that the founder of Spartan would see the article

because Davis would have two stories, not just "he sent me texts, which, honestly,

tons of married people do and isn't enough."  Id.  Davis also learned about the hot

tub incident from J.H.  [Doc. 112-1, p. 52].  He testified that what she told him

about this encounter "lined up exactly with what she had just said [regarding the

incident behind the wall], that she does not feel safe around this person and didn't

want to be alone with him," that J.H. seemed "very credible" and that he "believed

what she was telling [him]."  [Doc. 111-13, p. 68].  Davis chose not to include the

hot tub incident in the First Article, though, which he explained was an "editorial

choice."  Id. at 71.

Finally, Davis messaged with A.C. on October 16, 2019.  [Doc. 111-1, p.

56].  A.C. provided Davis with screenshots of some of her 2016 conversations with

Plaintiff.  Id.

Davis admitted that his investigation found "tons" of hearsay[14] but that

J.H.'s "personal story [was] proof of [Plaintiff's] behavior."  [Doc. 111-13, p. 82].

Davis explained that he could not write an article based on hearsay but instead

needed "to speak with people with firsthand experience."  Id.

---

[14] Davis clarified during his deposition that he used the term "hearsay" colloquially—
"not in the legal sense"—but rather to indicate someone telling him "I heard this."  [Doc.
111-13, p. 82].

Prior to publishing the First Article, Davis spoke to approximately twenty individuals, and many of their accounts corroborated the information Davis received.  [Doc. 111-1, p. 57].  Specifically, Davis testified that he "spoke to a large number of people and got consistent answers from a lot of people."  [Doc. 111-13, p. 36].  He stated that he distinguished fact from rumor by "talking to as many people as possible."  [Doc. 110-2, p. 42].  Davis did not rely on a source if he was uncertain about the source's credibility.  [Doc. 111-1, pp. 50, 60].  As to the women whose statements appear in the First Article, Davis testified that he "believed everything they told [him] to be true."  [Doc. 110-2, p. 24].

Davis testified that he was directed to some people who did not, in fact, have anything to tell him about Plaintiff or clarified that they were not victims of any inappropriate conduct.  [Doc. 111-13, pp. 84–85].  Davis conceded that he did not ask Plaintiff if he would share his messages with Davis.  Id. at 42.  After he finished drafting the First Article, Davis spent a day "triple checking" the information before publishing it.  [Doc. 111-1, p. 62].

Davis testified that he chose the title of the First Article, "#MeToo Hits OCR," to convey that the movement of women "coming forward with stories from abuse from men in power" had "come to the OCR community."  [Doc. 110-2, p. 30].  Davis also testified that the number of women complaining about Plaintiff

would give the serious allegations more credibility.  [Doc. 112-1, p. 68].  In a message to J.C. and A.D., Davis stated that the story would be "about rape allegations" but would also show Plaintiff's "bullying" pattern of behavior.  Id. at 67; see also [Doc. 111-13, p. 114].

Davis admitted that a purpose of the First Article was to generate more traffic to the ORM website.  [Doc. 111-27, p. 53].  Traffic to the ORM website impacts the amount of revenue generated for ORM and thus for Davis.  Id.  Davis also admitted that the First Article did, in fact, generate more traffic to the ORM website.  Id.

### 2.   Publication of the Articles

Defendants published the First Article, "#MeToo Hits OCR," on October 21, 2019.  [Doc. 111-1, p. 1].  The First Article contained the following statements, which Plaintiff alleges are defamatory.

- **Statement 47.A**:[15]  "[J.C.] and [A.D.] (how they asked to be referred to for this story) created the Facebook group with a simple post in another group, Spartans Of The Northeast. . . .  [J.C.] told us:  'I wanted to trademark the 4-0 name and was told that I would be sorry if I went off and did this on my own.'  [Plaintiff] wanted the three of us to go into business together and that is not something that we wanted to do.  He pretty much bullied me out of

---

[15] The statement numbers correspond to the numbered paragraphs of the Complaint.  The parties referred to the statements in this manner, and the Court adopts the same naming convention for ease of reference.

that group. . . .  He started texting me and threatening me. I ended up blocking his number on my phone, and blocked him on FB and Instagram.  To be completely honest with you . . . I was scared for my family after all of this.  I truly was.  That's why I am hesitant on talking.'"  Id. at 5 (ellipses in original); see also [Doc. 1, pp. 8–9].

- **Statement 47.B**:  "By 2017, it began to be known in some OCR circles that [Plaintiff] was using his role as Spartan 4-0 Administrator to consistently and aggressively reach out to women.  Some began to share pictures that [Plaintiff] had sent them.  However, if anyone shared these images in Spartan 4-0, the posts would immediately be deleted and the poster kicked out [of] the group.  If any man or woman questioned why people were kicked out, they too, would be removed." [Doc. 111-1, pp. 19–20]; see also [Doc. 1, pp. 9–10].

- **Statement 47.C**:  "Another woman who began a flirtatious relationship with [Plaintiff] posted her story in a private Facebook group and allowed us to share some of it.  Her communication with [Plaintiff] quickly grew from messages to phone calls.  'He used to talk about all the things he wanted to do to me sexually, he would call me at work and tell me these things.  He would then get mad when I wanted nothing to do with the conversations. He had offered on multiple occasions for me to fly out to New Jersey to see him.  He told me to buy a package deal and he would pay me back for the hotel if I got myself out there.  Once I learned he was doing this with so many other women, I called it off.  I never want this to happen to another woman so long as I live.  Coming from the abusive relationship I was in, he preyed on me in the worst possible time of my life.'"  [Doc. 111-1, p. 33] (alterations in original); see also [Doc. 1, pp. 10–11].

- **Statement 47.D**: "[A.C.] joined Spartan 4-0 after doing her first Spartan trifecta. Shortly thereafter, [Plaintiff] began wooing her through messages on Facebook. . . . 'After dinner, he drove me back to my house and insisted on walking me to the door. He saw all my Spartan stuff on the wall and let himself into my house. He picked up my Atlas ball put it down, turned around and attempted to kiss me. I asked him to leave. He called me two minutes [later] from his car. He told me he had driven over an hour for the date and that we would just talk if I let him sleep over. I had to tell him no, repeatedly before he got off the phone. That man does not like taking no for an answer.'" [Doc. 111-1, p. 36]; see also [Doc. 1, pp. 11–12].

- **Statement 47.E**: "We got another example from a woman who became friendly with [Plaintiff] and his wife in 2017. They completed a race together with a large group from Spartan 4-0. Shortly after the race, she told us that [Plaintiff] pulled her behind a wall. 'He started trying to make out with me. He was shoving his hand down my pants and putting my hand on his d**k, on the outside of his pants.' She was in shock as this was happening and did not know what to do. 'Your wife is literally just around the corner and I ran the whole race with her!'" [Doc. 111-1, p. 39] (alterations and asterisks in original); see also [Doc. 1, pp. 12–13].

- **Statement 47.F**: "Then we heard the most disturbing story of all from a woman named [K.C.]. . . . Shortly after joining the group she was pursued by [Plaintiff] and was charmed. She agreed to meet [Plaintiff] at the Hilton in East Brunswick NJ off I-95 in November 2015. She admittedly knew there would be some 'fooling around', but had no idea what would transpire. Shortly after [Plaintiff] entered the room, it became physical right away. He brought wine and began forcibly kissing her. She tried to slow things down, but was not successful.

> [Plaintiff] would drink from the bottle, then kiss her so
> the alcohol would go down her throat. 'He started
> getting aggressive and I said to stop, repeatedly. He
> then . . . slapped me in the face. He got a look on his
> face like this was going to happen no matter what and I
> knew I was in trouble. He grabbed the back of my head
> and aggressively forced his d**k in my mouth. I was
> crying and tried to push him back but he was smiling and
> loving it." [Doc. 111-1, pp. 42–43] (ellipses and
> asterisks in original); see also [Doc. 1, pp. 13–14].

The First Article was discussed in posts and comments in Spartan 4-0 and in Spartans of the Northeast. [Doc. 111-1, p. 68]. After the First Article was published, Spartan banned Plaintiff from participating in Spartan races. Id. The Spartan Founder and CEO, Joe De Sena, released a public statement on Instagram addressing the matter: "[Spartan] has received compelling information about [Plaintiff's] grossly inappropriate behavior towards women in its ongoing investigation, and has immediately banned him from future events. This decision was made in keeping with company protocol, and was not made lightly." Id.

After the First Article was published, Davis learned that Plaintiff posted about seeking legal counsel. [Doc. 112-1, p. 55]. Davis asked J.H. if she would "like to help [him] by saying it was nonconsensual." Id. Davis clarified that he was "asking her to reconfirm that [her encounter with Plaintiff was not] consensual" and to comment on Plaintiff's post "by reminding people" that it was not consensual. Id.

On October 22, 2019, Defendants published the Second Article, titled "Spartan Race Bans Ameer Haroun." [Doc. 111-1, p. 68]. Defendants republished the statement issued by Spartan announcing that Plaintiff was banned. [Doc. 112-1, p. 68]. Defendants updated the Second Article on October 23, 2019, and October 25, 2019, but did not retract or delete any of the statements, despite receiving a cease-and-desist letter from Plaintiff's counsel. Id. at 69. The Second Article noted that Plaintiff "posted a comment attacking Matt Davis and Obstacle Racing Media stating every accusation stems from 'consensual adult relationships." Id. This lawsuit followed.

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A material fact is any fact that "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Ultimately, "[t]he basic issue before the court on a motion for summary judgment is 'whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Allen, 121 F.3d at 646 (quoting Anderson, 477 U.S. at 251).

The party moving for summary judgment bears the initial burden of showing that no genuine issue exists as to any material fact, "and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." Id. After the movant satisfies this initial burden, the nonmovant bears the burden of showing specific facts indicating that summary judgment is improper because a material issue of fact does exist. Id. However, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting Anderson, 477 U.S. at 251). If the record taken as a whole cannot lead "a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)).

# IV.   ANALYSIS

Plaintiff brings claims for defamation and defamation per se, false light invasion of privacy and public disclosure of private facts against Defendants.  The Motion for Summary Judgment is primarily directed to the defamation claim. Defendants argue that Plaintiff's remaining claims "are based on the same allegedly defamatory statements" as the defamation claim and "merely repackage his defamation claim under alternative labels."  [Doc. 110-1, p. 10].  The Court thus begins with the claim for defamation[16] before addressing Plaintiff's claims for false light invasion of privacy and public disclosure of private facts.

## A.   Defamation

"Libel" is the "false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule."  O.C.G.A. § 51-5-1(a).  A plaintiff must prove four elements to establish a claim for defamation:  "(1) a false

---

[16] Plaintiff brings a claim for defamation per se in addition to defamation.  "'Libel per se consists of a charge that one is guilty of a crime, dishonesty or immorality.'"  Smith v. DiFrancesco, 802 S.E.2d 69, 72 (Ga. Ct. App. 2017) (quoting Zarach v. Atlanta Claims Ass'n, 500 S.E.2d 1, 5 (Ga. Ct. App. 1998)).  The primary difference between a claim for defamation and a claim for defamation per se is that the latter does not require proof of special damages.  StopLoss Specialists, LLC v. VeriClaim, Inc., 340 F. Supp. 3d 1334, 1350 (N.D. Ga. 2018).  Neither party, however, distinguished between these claims in the briefing, and thus the Court does not either.

and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." StopLoss Specialists, LLC v. VeriClaim, Inc., 340 F. Supp. 3d 1334, 1346 (N.D. Ga. 2018) (quoting Smith v. DiFrancesco, 802 S.E.2d 69, 72 (Ga. Ct. App. 2017)).  While the question of whether a particular communication is defamatory is typically one for the jury, "if the statement is not ambiguous and reasonably can have only one interpretation, the question of defamation is one of law for the court."  Speedway Grading Corp. v. Gardner, 425 S.E.2d 676, 678 (Ga. Ct. App. 1992).  When determining whether a publication is defamatory as a matter of law, the Court considers how it would be construed by an average reader. Lucas v. Cranshaw, 659 S.E.2d 612, 615 (Ga. Ct. App. 2008).

Defendants seek summary judgment on the defamation claim on four grounds:  (1) the statements at issue are either true or statements of opinion; (2) Plaintiff is a limited-purpose public figure in the OCR community, and Plaintiff failed to prove by clear and convincing evidence that the statements were published with actual malice; (3) the record lacks any evidence that Defendants acted negligently when publishing the statements at issue; and (4) the statements

are conditionally privileged under Georgia law.  The Court addresses these arguments below.

### 1.   Whether the Statements Are True or Statements of Opinion

"Critical to any defamation analysis is the issue of falsity, and the burden to prove that a published statement is false rests squarely with the plaintiff."  Bryant v. Cox Enters., Inc., 715 S.E.2d 458, 463 (Ga. Ct. App. 2011).  Because "defamatory statements must be false to be actionable, '[t]ruth is a complete defense to alleged libel or slander.'"  StopLoss Specialists, 340 F. Supp. 3d at 1347 (alteration in original) (quoting Cottrell v. Smith, 788 S.E.2d 772, 781 (Ga. 2016)).  "Substantial truth is all that is required."  Monge v. Madison Cnty. Rec., Inc., 802 F. Supp. 2d 1327, 1333 (N.D. Ga. 2011).  "'[M]inor factual errors, which do not go to the substance, the gist, the sting of [a] story' do not render a communication false for defamation purposes."  Jaillett v. Ga. Television Co., 520 S.E.2d 721, 724 (Ga. Ct. App. 1999) (alterations in original) (quoting Stange v. Cox Enters., Inc., 440 S.E.2d 503, 507 (Ga. Ct. App. 1994)).

As a general rule, "a defamation action will lie only for a statement of fact" because "a statement that reflects an opinion or subjective assessment, as to which reasonable minds could differ, cannot be proved false."  Gettner v. Fitzgerald, 677 S.E.2d 149, 153 (Ga. Ct. App. 2009).  Consequently, "a plaintiff who claims that a

published opinion defamed him will generally be unable to carry his burden of proving the essential element of falsity." Id.  This general rule, however, does not translate into a "wholesale defamation exception for anything that might be labeled opinion." Gast v. Brittain, 589 S.E.2d 63, 64 (Ga. 2003) (quoting Milkovich v. Lorain J. Co., 497 U.S. 1, 18 (1990)).  Instead, "[a]n opinion can constitute actionable defamation if the opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false." Id.

At the outset, the Court notes that Defendants introduced declarations from every woman whose allegations are included in the First Article verifying the truth of their statements.[17]  The Court also notes that the majority of Plaintiff's evidence as to the falsity of their published allegations is his own testimony.  For many of these statements, the record presents conflicting evidence—namely, the testimony of an accuser on one side and Plaintiff's testimony on the other.  On summary judgment, the Court must view the evidence in the light most favorable to the non-moving party—here, Plaintiff—without "weigh[ing] conflicting evidence or

---

[17] [Doc. 110-5, pp. 2–7] (declaration of J.C.); [Doc. 110-5, pp. 9–13] (declaration of A.D.); [Doc. 110-8, pp. 2–3] (declaration of T.A.S.); [Doc. 110-8, pp. 5–10] (declaration of A.C.); [Doc. 110–9, pp. 2–5] (declaration of J.H.); [Doc. 110-13, pp. 92–95] (declaration of K.C.).

[making] credibility determinations." <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996).  Therefore, where the record contains a genuine dispute of fact about the truth of a given statement, and particularly where the dispute entails a credibility determination, the Court may not decide the issue.  <u>Sconiers v. Lockhart</u>, 946 F.3d 1256, 1263 (11th Cir. 2020) ("[W]hen competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible.  Indeed, if 'the only issue is one of credibility,' the issue is factual, and a court cannot grant summary judgment." (citation omitted) (quoting <u>Mize</u>, 93 F.3d at 742–43)).  The Court addresses each statement individually and will reproduce each statement at the beginning of the respective discussion for ease of reference.

### a.      Statement 47.A:  J.C. and A.D.

Statement 47.A is as follows:

> "[J.C.] and [A.D.] (how they asked to be referred to for this story) created the Facebook group with a simple post in another group, Spartans Of The Northeast. . . .  [J.C.] told us:  'I wanted to trademark the 4-0 name and was told that I would be sorry if I went off and did this on my own.'  [Plaintiff] wanted the three of us to go into business together and that is not something that we wanted to do.  He pretty much bullied me out of that group. . . .  He started texting me and threatening me.  I ended up blocking his number on my phone, and blocked him on FB and Instagram.  To be completely honest with you . . . I was scared for my family after all of this.  I truly was.  That's why I am hesitant on talking.'"

[Doc. 111-1, p. 5] (ellipses in original); see also [Doc. 1, pp. 8–9].  Defendants

assert that Statement 47.A is not actionable because it is a statement of opinion.

Plaintiff contends that J.C.'s and A.D.'s "feelings and perceptions about whether

they were bullied are irrelevant."  [Doc. 111, p. 3].  Plaintiff is incorrect.  J.C.'s

and A.D.'s perceptions about whether they were bullied are "subjective

assessment[s] as to which reasonable minds could differ."  Gettner, 677 S.E.2d at

153.

        Plaintiff also asserts that he has proven false the statement that he threatened

J.C. by telling her that she "would be sorry" if she "went off and did this on [her]

own."  [Doc. 111-1, p. 5]; see [Doc. 111, p. 4].  The record contains conflicting

evidence on this point.  J.C. submitted a sworn declaration attesting that this

statement was true, and Plaintiff admitted that he texted with J.C. and no longer

has all of those text messages.  Plaintiff, however, denies ever texting with J.C.

about the trademark issue or ever sending her a threatening message.

Consequently, the only evidence Plaintiff offers to refute this statement is his own

denial.  But because Plaintiff is the non-movant, the Court must "resolve all

ambiguities and draw reasonable factual inferences from the evidence in [his]

favor."  Buending, 10 F.4th at 1130 (quoting Layton v. DHL Express (USA), Inc.,

686 F.3d 1172, 1175 (11th Cir. 2012)).  The Court therefore declines to hold as a

matter of law that the following portion of Statement 47.A is not actionable:

"[J.C.] told us:  'I wanted to trademark the 4-0 name and was told that I would be

sorry if I went off and did this on my own.'"  [Doc. 111-1, p. 5].  The remainder of

Statement 47.A, however, is a statement of opinion and as such cannot support a

claim for defamation.

### b.    Statement 47.B:  Moderation of Spartan 4-0 Content

Statement 47.B is as follows:

> "By 2017, it began to be known in some OCR circles that
> [Plaintiff] was using his role as Spartan 4-0 Administrator to
> consistently and aggressively reach out to women.  Some began
> to share pictures that [Plaintiff] had sent them.  However, if
> anyone shared these images in Spartan 4-0, the posts would
> immediately be deleted and the poster kicked out [of] the group.
> If any man or woman questioned why people were kicked out,
> they too, would be removed."

[Doc. 111-1, pp. 19–20]; see also [Doc. 1, pp. 9–10].  According to Defendants,

"[t]he evidence shows that Statement 47.B is true."  [Doc. 110-1, p. 15].  Plaintiff

disagrees, arguing that some people who engaged in conduct similar to that

described in Statement 47.B were *not* removed from the group.  See [Doc. 111, p.

4].

The record in this case shows that Statement 47.B is true.  Plaintiff admitted

the following facts:  he asked women in Spartan 4-0 to send him sexual pictures of

themselves; he sent women in Spartan 4-0 sexual pictures of himself; he removed

members from Spartan 4-0 that interacted with content about his behavior toward women; and he had a role in blocking or removing members of Spartan 4-0 generally.  To the extent that Plaintiff disputes Davis's characterization of his actions as "consistent" or "aggressive," these are statements of opinion—namely, Davis's subjective assessment of the facts disclosed in the statement—that are not actionable.

Plaintiff objects to this statement because he contends that, for example, Davis was *not* removed from the group, and "others who publicly posted about the allegations were not kicked out simply for doing so."  [Doc. 111, p. 4].  Georgia law, however, does not recognize libel by omission:  "As long as facts are not misstated, distorted or arranged so as to convey a false and defamatory meaning, there is no liability for a somewhat less than complete report of the truth."  Jaillett, 520 S.E.2d at 725 (quoting Blomberg v. Cox Enters., Inc., 491 S.E.2d 430, 432 (Ga. Ct. App. 1997)).  Even if some members of Spartan 4-0 were not removed from the group, it remains true that others were.  In sum, sufficient evidence shows that Statement 47.B is true.

### c.   Statement 47.C:  T.A.S.

Statement 47.C. is as follows:

> "Another woman who began a flirtatious relationship with [Plaintiff] posted her story in a private Facebook group and

> allowed us to share some of it.  Her communication with
> [Plaintiff] quickly grew from messages to phone calls.  'He
> used to talk about all the things he wanted to do to me sexually,
> he would call me at work and tell me these things.  He would
> then get mad when I wanted nothing to do with the
> conversations.  He had offered on multiple occasions for me to
> fly out to New Jersey to see him.  He told me to buy a package
> deal and he would pay me back for the hotel if I got myself out
> there.  Once I learned he was doing this with so many other
> women, I called it off.  I never want this to happen to another
> woman so long as I live.  Coming from the abusive relationship
> I was in, he preyed on me in the worst possible time of my
> life.'"

[Doc. 111-1, p. 33] (alterations in original); see also [Doc. 1, pp. 10–11].

Defendants contend that Statement 47.C is true and merely "describes T.A.S.'s

perception that Plaintiff took advantage of ('preyed on') her at a vulnerable time in

her life."  [Doc. 110-1, p. 16].  Plaintiff claims that Statement 47.C is false and

contends that Defendants "falsely portray T.A.S. as not being interested in talking

about sex with Plaintiff."  [Doc. 111, p. 4].

The record shows that many parts of Statement 47.C are true.  It is

undisputed that Plaintiff and T.A.S. exchanged messages and phone calls; that

Plaintiff talked to T.A.S. about things he wanted to do to her sexually; and that

Plaintiff offered to fly T.A.S. to New Jersey.  However, Plaintiff denies ever

becoming angry at T.A.S. if she wanted to end a conversation.  The record also

shows that these exchanges, at least at the beginning, were mutual and reciprocal.

This evidence is thus in conflict with T.A.S.'s assertion in Statement 47.C that "[she] wanted nothing to do with the conversations."  [Doc. 111-1, p. 33].  "To the extent that evidence conflicts at summary judgment, the district court has an obligation to 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'"  Allen v. Bd. of Pub. Educ. for Bibb Cnty., 495 F.3d 1306, 1315 (11th Cir. 2007) (quoting Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999)).  Consequently, this conflict in the evidence as to the nature of T.A.S. and Plaintiff's relationship prevents the Court from determining that this statement is true as a matter of law.

### d.     Statement 47.D:  A.C.

Statement 47.D is as follows:

> "[A.C.] joined Spartan 4-0 after doing her first Spartan trifecta.  Shortly thereafter, [Plaintiff] began wooing her through messages on Facebook. . . .  'After dinner, he drove me back to my house and insisted on walking me to the door.  He saw all my Spartan stuff on the wall and let himself into my house.  He picked up my Atlas ball put it down, turned around and attempted to kiss me.  I asked him to leave.  He called me two minutes [later] from his car.  He told me he had driven over an hour for the date and that we would just talk if I let him sleep over.  I had to tell him no, repeatedly before he got off the phone.  That man does not like taking no for an answer.'"

[Doc. 111-1, p. 36]; see also [Doc. 1, pp. 11–12].  Defendants argue that Statement 47.D is true and assert that Plaintiff admitted "the truth of the material facts of

A.C.'s account of their date."  [Doc. 110-1, p. 17].  Plaintiff contends that this statement is false and portrays him inaccurately.  See [Doc. 111, p. 5].

The record shows that Statement 47.D is largely true.  It is undisputed that Plaintiff sent A.C. messages on Facebook; that Plaintiff and A.C. went to dinner, after which he went inside her home; that A.C. asked Plaintiff to leave; and that Plaintiff called A.C. and asked to sleep at her house and that she repeatedly said "no."  However, the record contains conflicting evidence about whether Plaintiff "insisted" on walking A.C. to her door; A.C. affirms that this was the case, while Plaintiff testified to the contrary.  The record also contains contradictory evidence about whether Plaintiff "attempted" to kiss A.C. (her position) or whether the kiss was mutual (his).  Defendants note that Plaintiff himself corroborated the "gist" of this statement when he sent A.C. a message apologizing that she felt "rushed for sex."  See [Doc. 110-1, p. 17].  It is true that minor inaccuracies that do not speak to the substance or gist of a story do not render that story false for the purposes of a defamation claim.  See Jaillett, 520 S.E.2d at 724.  However, whether Plaintiff insisted on coming inside A.C.'s home and whether their kiss was mutual seem to speak to the "gist" of this statement, and as such, the accuracy of these statements does matter.  The Court thus declines to hold that Statement 47.D is true as a matter of law.

### e.    Statement 47.E:  J.H.

Statement 47.E is as follows:

> "We got another example from a woman who became friendly
> with [Plaintiff] and his wife in 2017.  They completed a race
> together with a large group from Spartan 4-0.  Shortly after the
> race, she told us that [Plaintiff] pulled her behind a wall.  'He
> started trying to make out with me. He was shoving his hand
> down my pants and putting my hand on his d**k, on the outside
> of his pants.'  She was in shock as this was happening and did
> not know what to do.  'Your wife is literally just around the
> corner and I ran the whole race with her!'"

[Doc. 111-1, p. 39] (alterations and asterisks in original); see also [Doc. 1, pp. 12–

13].  Defendants argue that Plaintiff either admits the contents of Statement 47.E or

cannot remember them and therefore cannot prove them to be untrue.  Plaintiff

contends that this statement is false.

The record contains conflicting evidence about Statement 47.E.  J.H. averred

that Plaintiff pulled her behind a wall, shoved his hand down her pants and placed

her hand on his penis over his clothes.  See [Doc. 110-9, pp. 3–4].  Plaintiff

testified that he and J.H. "felt each other up" and that he could not "recall if during

that encounter, if [his hand] was down her pants or whether it was under her shirt,

whether it was above her pants, outside or inside" and that they "were both

passionately kissing and feeling each other."  [Doc. 111-2, p. 48].  Plaintiff also

testified that he did not "pull" J.H. behind the wall.  [Doc. 93-7, p. 35].

Determining whether Statement 47.E is true would require assessing the credibility

of these accounts and weighing the disputed evidence in the record, which "'are

jury functions, not those of a judge.'"  <u>Allen</u>, 495 F.3d at 1315 (quoting <u>Anderson</u>,

477 U.S. at 255).  Therefore, the Court declines to hold that Statement 47.E is true

as a matter of law.

### f.      Statement 47.F:  K.C.

Statement 47.F is as follows:

> "Then we heard the most disturbing story of all from a woman
> named [K.C.]. . . . Shortly after joining the group she was
> pursued by [Plaintiff] and was charmed.  She agreed to meet
> [Plaintiff] at the Hilton in East Brunswick NJ off I-95 in
> November 2015.  She admittedly knew there would be some
> 'fooling around', but had no idea what would transpire.  Shortly
> after [Plaintiff] entered the room, it became physical right
> away.  He brought wine and began forcibly kissing her. She
> tried to slow things down, but was not successful.  [Plaintiff]
> would drink from the bottle, then kiss her so the alcohol would
> go down her throat.  'He started getting aggressive and I said to
> stop, repeatedly.  He then . . . slapped me in the face.  He got a
> look on his face like this was going to happen no matter what
> and I knew I was in trouble.  He grabbed the back of my head
> and aggressively forced his d**k in my mouth.  I was crying
> and tried to push him back but he was smiling and loving it."

[Doc. 111-1, pp. 42–43] (ellipses and asterisks in original); <u>see also</u> [Doc. 1, pp.

13–14].  Defendants argue that Plaintiff admits the majority of Statement 47.F and

that the "gist" of this statement is substantially true.  [Doc. 110-1, p. 20].  Plaintiff

asserts that Statement 47.F is false and seems to argue that this statement omits

relevant facts, such as the messages exchanged between Plaintiff and K.C. after this encounter.  [Doc. 111, pp. 6–7].

The basic facts of Statement 47.F appear to be true or at least undisputed. Plaintiff and K.C. met at a hotel in New Jersey, where they both anticipated having some kind of sexual encounter.  Plaintiff brought wine, and some of it entered K.C.'s mouth while they kissed.  At some point, Plaintiff's penis was in K.C.'s mouth.  Moreover, portions of this statement—that Plaintiff behaved aggressively—seem to reflect K.C.'s "subjective assessment" of the encounter, which cannot be proved false.  Gettner, 677 S.E.2d at 153.

What is disputed, however, is the degree to which this encounter was consensual.  K.C. averred that the description of events in Statement 47.F is true, including the allegation that Plaintiff slapped her and forced her to perform oral sex.  K.C. also referenced being slapped by Plaintiff in the messages they exchanged immediately after this encounter.  Plaintiff testified that K.C. consented to performing oral sex and that he did not slap her.  Deciding which account of events is more credible—which would be necessary to determine whether Statement 47.F is true—is not the province of the Court.  Gallagher Benefit Servs., Inc. v. Campbell, 528 F. Supp. 3d 1326, 1334 (N.D. Ga. 2021) ("[T]he Court's role is not to 'weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial.'" (quoting <u>Sears v. Roberts</u>, 922 F.3d 1199, 1205 (11th Cir. 2019))). Accordingly, the Court declines to hold that Statement 47.F is true as a matter of law.

* * *

To summarize, the Court determined above that a portion of Statement 47.A is not actionable because it is a statement of opinion and Statement 47.B is not actionable because it is true. The Court declined to hold as a matter of law that the following statements are either true or statements of opinion: a portion of Statement 47.A, Statement 47.C, Statement 47.D, Statement 47.E and Statement 47.F.

### 2. Whether Defendants Acted Negligently or with Actual Malice

Having addressed the first element of a claim for defamation—a false and defamatory statement—the Court now turns to whether Defendants acted with the requisite standard of liability. This inquiry entails two questions. The first question is which standard applies—negligence or actual malice—and the second is whether the record shows that Defendants' actions were either negligent or malicious. To answer the first question, the Court must determine whether Plaintiff is a private individual (which entails a showing of negligence) or a public

figure (which requires the more rigorous showing of actual malice).  The Court

will then assess Defendants' actions under the appropriate standard.

     **a.**    **Whether Plaintiff Is a Limited-Purpose Public Figure**

In a defamation suit, "[a] plaintiff's status as either a private figure or a

public figure determines the proper standard of liability for the element of fault."

Gettner, 677 S.E.2d at 154.  A plaintiff who is a private figure "must prove that the

defendant acted with ordinary negligence."  Id.  "A plaintiff who is a public figure,

on the other hand, must meet a more stringent standard of liability; a public figure

must prove by clear and convincing evidence that the defendant acted with actual

malice."  Id.  Whether a plaintiff is a public figure or a private figure is a question

of law for resolution by the Court.  Id. at 154–55.

Courts have recognized two kinds of public figures:  those who are public

figures in all settings ("general-purpose public figures") and those who are public

figures in only limited circumstances ("limited-purpose public figures").  See

Riddle v. Golden Isles Broad., LLC, 621 S.E.2d 822, 825 (Ga. Ct. App. 2005).

General-purpose public figures "hold positions with such pervasive fame or power

that they are deemed public figures for all purposes."  Mathis v. Cannon, 573

S.E.2d 376, 381 (Ga. 2002).  An individual may be a limited-purpose public figure,

on the other hand, when he "'voluntarily injects himself or is drawn into a

particular public controversy and thereby becomes a public figure for a limited range of issues.'" Id. (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974)).  Courts use a three part-test to determine whether an individual is a limited-purpose public figure:  (1) "isolate the public controversy," (2) "examine the plaintiff's involvement in the controversy" and (3) "determine whether the alleged defamation was germane to the plaintiff's participation in the controversy." Atlanta J.-Const. v. Jewell, 555 S.E.2d 175, 183 (Ga. Ct. App. 2001).

Defendants argue that Plaintiff is a limited-purpose public figure, requiring Plaintiff to show that Defendants acted with actual malice in publishing the statements at issue.  Plaintiff counters that he is a private figure and that Defendants are thus held to the lower standard of negligence.  The Court discusses each prong of the limited-purpose public figure test below.

### i.       Public Controversy

The first step of the limited-purpose public figure analysis requires the Court to identify "a public controversy, which 'must be more than merely newsworthy.'" Ladner v. New World Commc'ns of Atlanta, Inc., 806 S.E.2d 905, 911 (Ga. Ct. App. 2017) (quoting Riddle, 621 S.E.2d at 826).  "[I]t is not the global nature of the public's interest that defines a dispute as a public controversy, but rather whether the issue generates discussion, debate, and dissent in the relevant

community . . . ."  <u>Mathis</u>, 573 S.E.2d at 382.  In other words, "'if the issue was

being debated publicly and if it had foreseeable and substantial ramifications for

nonparticipants, it was a public controversy.'"  <u>Riddle</u>, 621 S.E.2d at 826 (quoting

<u>Silvester v. Am. Broad. Cos.</u>, 839 F.2d 1491, 1494–95 (11th Cir. 1988)).

　　　Defendants contend that Plaintiff's leadership of Spartan 4-0 and his conduct

toward women represent a preexisting controversy that sparked discussion and

debate within Spartan 4-0 and that had implications for nonparticipants because it

"raised concerns about [Plaintiff's] suitability as a leader in the community."

[Doc. 110-1, p. 24].  Plaintiff argues that Defendants define the alleged

controversy too broadly and that Plaintiff's "private, romantic relationships" do not

constitute a public controversy.  [Doc. 111, p. 7].

　　　The evidence in this case shows that prior to the publication of the First and

Second Articles, Plaintiff's conduct toward women—whether sending sexual

messages or his relationships with women in Spartan 4-0 more generally—was an

issue in Spartan 4-0 that generated significant  "discussion" and "debate" in the

Facebook group.  The debates in posts and comments were substantial enough that

they prompted a lengthy conversation among the administrators of Spartan 4-0

about how to manage the issue.  Moreover, it appears that the allegations about

Plaintiff's conduct had ramifications for members of Spartan 4-0 who were not

directly involved in the controversy, given that members of the group left after the allegations were discussed within Spartan 4-0.

Plaintiff argues that "there was no ongoing *public* debate about [his] private, romantic relationships." [Doc. 111, p. 7]. However, the "global nature" of the public interest in a dispute is not dispositive; what matters is "whether the issue generates discussion, debate, and dissent in the relevant community, which in this case happens to be a [Facebook group]." Mathis, 573 S.E.2d at 382. There is no requirement that the controversy affect the public at large. See Jewell, 555 S.E.2d at 183 (noting that a public controversy for this purpose must "affect the general public *or some segment of it* in an appreciable way" (emphasis added)). Moreover, the Court is unconvinced by Plaintiff's framing of the dispute as concerning merely his "private, romantic relationships." The record shows that allegations about Plaintiff's conduct toward women became public within the 15,000-person Spartan 4-0 Facebook group and raised concerns about his role as a leader of that group.

Plaintiff points this Court to Riddle, arguing that he is like the plaintiff in that case. In Riddle, a radio station aired a phone call from an anonymous listener who asked whether the plaintiff, an aspiring musician, had murdered his girlfriend. 621 S.E.2d at 824. In reality, the plaintiff's girlfriend was alive, and the record

contained no information about either a missing persons or murder investigation.

Id.  The plaintiff sued the radio station for defamation, and the trial court

determined that because the plaintiff was a public figure, he had to show that the

radio station acted with actual malice.  Id.  The Georgia Court of Appeals

determined that the plaintiff was neither a general-purpose nor limited-purpose

public figure.  Id. at 826.  Importantly, the lower court had "failed to identify a

public controversy in [the] case—the first and most fundamental step in

determining whether a person is a limited purpose public figure."  Id.  On appeal,

the court noted that while the girlfriend's disappearance "might have been

newsworthy, there [was] no evidence that it was actually publicized in the media."

Id.

        Plaintiff reasons that here, similarly, "nothing was ever published in the

media regarding [his] private relationships" prior to the publication of the articles.

[Doc. 111, p. 8].  But in Riddle, there was no evidence of any public controversy at

all; here, there is considerable evidence of a public controversy within the relevant

community of Spartan 4-0.  Furthermore, media coverage does not always precede

a public controversy, nor is it a prerequisite to finding that a public controversy

exists.  Such a requirement would seem to collapse the distinction between a

general-purpose public figure and a limited-purpose public figure.  Riddle, 621

S.E.2d at 825 (describing the factors courts use when determining whether an individual is a general-purpose public figure, such as "'[p]revious coverage of the plaintiff in the press'" and whether the plaintiff "'has access to the media'" (quoting Waldbaum v. Fairchild Publ'ns, Inc., 627 F.2d 1287, 1295 (D.C. Cir. 1980))).

In any event, Georgia courts have been clear that the scope of the necessary public controversy, and thus of the limited-purpose public figure analysis, is within the relevant community and not as to the general public.  See Cottrell v. Smith, 788 S.E.2d 772, 782 (Ga. 2016) (finding that the plaintiff was a limited-purpose public figure "in the spheres of running and Christian evangelism").  The Court thus finds that a public controversy about Plaintiff's conduct toward women generated sufficient "discussion, debate, and dissent in the relevant community," Mathis, 573 S.E.2d at 382, of Spartan 4-0 to satisfy the first prong of the limited-purpose public figure test.

### ii.      Plaintiff's Involvement

The second prong of the limited-purpose public figure test requires the Court to "examine the plaintiff's involvement in the controversy." Id. at 381.  A plaintiff in a defamation case may be deemed a limited-purpose public figure "if he purposefully tries to influence the outcome of a public controversy or, because of

58

his position in the controversy, could realistically be expected to have an impact on its resolution." Jewell, 555 S.E.2d at 184. Courts may consider the plaintiff's past conduct, the extent of any press coverage and the public reaction to the plaintiff's conduct when making this assessment. Id. The Court "must examine these factors as they existed before the alleged defamation was published." Id. Importantly, "[w]hether a person has voluntarily injected himself into a public controversy in order to have an impact on its outcome cannot be determined solely by reference to the actor's subjective motives." Id. at 185. Instead, the Court must determine "whether a reasonable person would have concluded that [the actor] would play or was seeking to play a major role in determining the outcome of the controversy." Id.

Defendants contend that "Plaintiff's voluntary decision to comment on this public controversy" satisfies this element of the analysis. [Doc. 110-1, p. 25]. Defendants also argue that Plaintiff used his position as leader of Spartan 4-0 to "influence the outcome of the allegations against him" by deleting posts in the group that criticized his conduct. Id. Plaintiff counters that he "did not thrust himself into any public controversy or attempt to influence any kind of outcome." [Doc. 111, p. 11].

59

The record contains sufficient evidence that Plaintiff either "inject[ed] himself or [was] drawn into'" the controversy.  Jewell, 555 S.E.2d at 185 (emphasis omitted) (quoting Gertz, 418 U.S. at 351).  Most tellingly, Plaintiff addressed the allegations in multiple posts in Spartan 4-0.  Plaintiff also deleted posts on this topic and removed members from the group after they posted about or commented on his conduct toward women.  These facts show at the very least that Plaintiff's "position in the controversy," as a leader of Spartan 4-0, was such that he "could realistically be expected to have an impact on its resolution."  Id. at 184.

Plaintiff likens himself to the plaintiff in Sewell v. Trib Publications, Inc., a teacher who made critical statements in his classroom about the United States' military involvement in Iraq.  622 S.E.2d 919, 921 (Ga. Ct. App. 2005).  One of the teacher's students conveyed the comments to a local newspaper, which reported that the teacher "made certain anti-American statements in his classroom while refusing to allow any contrary views to be expressed."  Id.  The teacher sued the newspaper and others for defamation, and the trial court awarded summary judgment to the defendants on the basis that the teacher was a limited-purpose public figure and that the record did not show actual malice.  Id.  The Georgia Court of Appeals reversed this finding, concluding that the teacher, by discussing America's military involvement in Iraq, "in no way thrust himself to the forefront

of the controversy in any public forum." Id. at 923.  The court distinguished the teacher from plaintiffs in earlier defamation cases, noting that "he certainly was not an actor in the events giving rise to the public controversy, as were plaintiffs in Mathis, Jewell, and Silvester," since the controversy in Sewell, "concerning the Iraq war, was of a global nature."[18] Id. at 924.  But Plaintiff here is not just *an* actor—he is *the* actor—in the events giving rise to the public controversy.  Sewell, therefore, does not help Plaintiff.

In sum, the record in this case supports a finding that Plaintiff was involved in the relevant controversy, thus meeting the second prong of the limited-purpose public figure analysis.

### iii.     Relevance of Alleged Defamation to Plaintiff's Involvement

The final factor "requires the court to ascertain whether the allegedly defamatory statements were germane to [the plaintiff's] participation in the controversy." Jewell, 555 S.E.2d at 185.  This is a low bar:  "Anything which

---

[18] Mathis, Jewell, and Silvester are noteworthy cases in the history of the limited-purpose public figure doctrine.  The Eleventh Circuit Court of Appeals set forth the three-part inquiry for determining whether an individual is a limited-purpose public figure in Silvester v. American Broadcasting Cos., 839 F.2d 1491, 1494 (11th Cir. 1988), adopting the test's articulation from Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1297 (D.C. Cir. 1980).  The Georgia Court of Appeals then used this test in Jewell, 555 S.E.2d at 183, a 2001 case, and the Supreme Court of Georgia adopted it the next year in Mathis, 573 S.E.2d at 381.

might touch on the controversy is relevant."  Id.  "[A] publication is germane to a plaintiff's participation in a controversy if it might help the public decide how much credence should be given to the plaintiff."  Id.

Defendants argue that "the challenged statements speak directly" to the public controversy.  [Doc. 110-1, p. 26].  Plaintiff contends that "the controversy would be limited to recruiting Group members and being the team leader for a few Spartan events where the team won the 'biggest team award'" and that the articles clearly do not speak to these topics.  [Doc. 111, p. 12].  However, the Court determined above that the public controversy in this case concerned Plaintiff's conduct toward women and the allegations about that conduct in Spartan 4-0.  The First Article focuses entirely on those issues.  The final prong of the limited-purpose public figure test is thus satisfied.  The Court finds that Plaintiff is a limited-purpose public figure, and, as such, Plaintiff must show that Defendants acted with actual malice in publishing the allegedly defamatory statements.

### b.     Whether Defendants Acted with Actual Malice

In the context of a defamation claim by a limited-purpose public figure, "actual malice" is "not merely spite or ill will, or even outright hatred; it must constitute actual knowledge that a statement is false or a reckless disregard as to its truth or falsity."  Atlanta Humane Soc'y v. Mills, 618 S.E.2d 18, 24 (Ga. Ct. App.

2005).  "'Reckless disregard requires clear and convincing proof that a defendant was aware of the likelihood he was circulating false information.'"  Id. (quoting Davis v. Shavers, 484 S.E.2d 243, 248 (Ga. Ct. App. 1997)).  In other words, "'[t]he evidence must show in a clear and convincing manner that a defendant in fact entertained serious doubts as to the truth of his statements.'"  Id. (quoting Davis, 484 S.E.2d at 248).

At the summary judgment phase, "the defendant in a defamation case 'must negate the plaintiff's claim of actual malice by establishing that it lacked knowledge that the defamatory matter was false or did not publish it with reckless disregard as to whether it was false or not.'"  Ladner, 806 S.E.2d at 914 (quoting Torrance v. Morris Publ'g Grp., LLC, 656 S.E.2d 152, 153 (Ga. Ct. App. 2007)).  Once the defendant "carries this burden, it becomes the duty of the defamation plaintiff 'to come forward with evidence of malice so as to create a jury issue on this claim.'"  Id. (quoting Torrance, 656 S.E.2d at 153).  The standard of proof to show actual malice is "extremely high."  Mills, 618 S.E.2d at 24.

After reviewing the parties' arguments and the record in this case, the Court finds insufficient evidence of actual malice.  First, Defendants have established that they lacked knowledge that the statements at issue were false.  Although the Court held above that a jury question remains as to whether certain statements in

the First Article are true, this determination does not equate to a conclusion that the statements are false.  In fact, the Court's earlier analysis shows that the overwhelming majority of the allegedly defamatory statements convey facts that are true or undisputed, which weighs heavily against finding that Defendants were "aware of the likelihood that [they were] circulating false information."  Miller v. Woods, 349 S.E.2d 505, 507 (Ga. Ct. App. 1986).  Davis explicitly testified that he believed that the women whose statements appear in the First Article were truthful.  See, e.g., Ladner, 806 S.E.2d at 915 ("The evidence shows no knowledge on the part of [the TV station or reporter] that [the] reports were false; to the contrary, [the reporter] asserted that he believed at the time and continued to believe they were accurate.").  In fact, Defendants provided declarations from these women in which they attest that their contributions were true.  Cf. ACLU, Inc. v. Zeh, 864 S.E.2d 422, 441 (Ga. 2021) (concluding, on a motion to dismiss a defamation claim, that the pleadings failed to show actual malice in part because "at the time the ACLU published the blog post, it *knew* information that supported [the] allegations, but *did not know* information indicating that the allegations were false").  Defendants thus lacked knowledge of falsity when they published the First Article.

Second, Defendants have shown that they did not publish the First Article with reckless disregard for its truth or, in other words, that they did not "'in fact entertain[] serious doubts as to the truth of [the] publication.'" Brewer v. Rogers, 439 S.E.2d 77, 81 (Ga. Ct. App. 1993) (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968)). Davis did not publish the First Article until he gathered the accounts of multiple women, and he stated that he spoke to twenty individuals in the course of his investigation and chose not to rely on sources that he found to be lacking in credibility. Davis also testified that he "triple-checked" the information in the First Article prior to its publication.

The facts of Torrance v. Morris Publishing Group, LLC, 656 S.E.2d at 153–54, are instructive on this issue and are similar to the facts before the Court. In that case, the city manager of Vidalia sued for defamation after a newspaper published articles that discussed the city manager's employment status, his alleged drug use and his role in the events underlying an investigation conducted by the Georgia Bureau of Investigation. Id. at 154. Because the city manager was a public figure, he had to "meet a very high standard of proof to prevail on the issue of defamation"—actual malice. Id.

The Torrance court determined that the defendants lacked knowledge that the newspaper articles were false and that they did not publish the articles with

65

reckless disregard for the truth.  Id. at 155.  Importantly, "the reporters who investigated and wrote the stories testified by affidavit that they thoroughly researched the stories, wrote them carefully, and reread them as they went through the editing process."  Id.  The reporters "detailed the sources for each of the statements complained of" by the city manager.  Id.  Finally, they "swore that they reported the information provided by an identified source and had no reason to believe the information provided was false."  Id.  The city manager failed to come forward with evidence of actual malice in response, and thus the court in Torrance found for the defendants.  Id. at 156 (affirming the award of summary judgment to the defendants where the city manager "failed to meet his heavy burden to show actual knowledge or reckless disregard of truth or falsity").

Here, Davis testified in his deposition about his thorough research and investigation of the allegations against Plaintiff and about his careful review prior to publishing the First Article.  Similar to the reporters in Torrance, Davis also "detailed the sources for each of the statements complained of" by Plaintiff, provided documentation of his exchanges with those individuals and filed sworn declarations from every woman whose allegations appear in the First Article. Finally, Davis relied only on those sources he found to be credible and, like the

Torrance defendants, testified that he had no reason to believe that those sources provided false or untruthful information.

Accordingly, Defendants have shown that they lacked knowledge that any statements in the First Article were false and that they did not publish the First Article with reckless disregard for its truth. As such, Plaintiff must present sufficient evidence of actual malice to create a jury question on this issue. Plaintiff offers several arguments concerning actual malice, but as explained below, these arguments are unavailing.

Plaintiff argues that Davis should have doubted the veracity of the accounts that he gathered for the First Article. See [Doc. 111, p. 16]. Again, Davis testified that he believed that all of the women were telling the truth. Nonetheless, Plaintiff suggests that the hot tub encounter between J.H. and Plaintiff should have given Davis pause about the accuracy of J.H.'s account of the initial incident behind the wall. However, Davis testified that he believed J.H., found her credible and simply chose not to include the hot tub incident as an editorial decision. Ultimately, Plaintiff "cannot show actual malice merely by making assertions contrary to those of the identified sources from which [Defendants] obtained their information." Torrance, 656 S.E.2d at 152.

In the same vein, Plaintiff contends that Davis should have questioned K.C.'s account of the hotel room incident.  Plaintiff argues that "Davis was aware that K.C.'s allegations were brought to Spartan's attention" and that Spartan "disregarded them."  [Doc. 111, p. 14].  Assuming that Plaintiff is referring to the report made by K.C.'s boyfriend, it is not true that Spartan "disregarded" these allegations.  See supra note 13.  Spartan's response indicated that because the allegations were criminal in nature, it was not equipped to evaluate them without additional information.  Plaintiff also seems to suggest that the messages exchanged between Plaintiff and K.C. after their encounter in the hotel room should have caused Davis to doubt the truth of K.C.'s allegations.  See, e.g., [Doc. 112-1, p. 59].  Of course, Davis learned about these messages *after* the First Article was published, and thus they have limited relevance when assessing whether Davis doubted the truth of the First Article at the time of its publication.  In any event, Davis testified clearly that these messages did not cast any doubt in his mind.[19]  In

---

[19] Plaintiff refers to these messages several times throughout the briefing, interpreting them as showing that his encounter with K.C. was consensual.  See, e.g., [Doc. 111, pp. 6–7] ("If K.C. was violently raped on her first date with Plaintiff, she would not have pressured him to be in a committed relationship days after the alleged violent assault, and then immediately start making allegations only when it became clear that Plaintiff was not interested in a relationship with her.").  But in the course of the exchange, K.C. states that Plaintiff "took advantage of a situation," put pressure on her, "slapped [her] in the face" and "was aggressive."  [Doc. 111-14, pp. 72–73].  Thus, rather than cast doubt on

sum, Plaintiff's contentions about what Davis should or should not have believed—particularly when Davis provided testimony on his *actual* beliefs—do not provide sufficient evidence of actual malice.

Plaintiff appears to argue that Davis failed to perform proper due diligence, particularly regarding J.H. and K.C., by neglecting to ask certain questions or request specific evidence.  However, "failure to investigate fully or to the degree desired by the plaintiff 'does not evince actionable reckless disregard.'"  <u>Torrance</u>, 656 S.E.2d at 156 (quoting <u>Brewer</u>, 439 S.E.2d at 82).  Actual malice is not concerned with "what a reasonably prudent man would have done under similar circumstances" or "whether a reasonably prudent man would have conducted further investigation"; the proper inquiry is whether the defendant held substantial doubt about the truth of the published statements.  <u>Miller</u>, 349 S.E.2d at 507.  Plaintiff's arguments about the nature of Davis's investigation are not enough to create a jury question on the issue of actual malice.

Plaintiff does make a passing reference, through a single case citation, to the applicability of the hot news doctrine to this case and its implications for the actual malice standard.  <u>See</u> [Doc. 111, p. 13].  "When an article is not in the category of

---

K.C.'s account of the hotel room incident, as Plaintiff reads them, these messages could also be viewed as corroborating K.C.'s version of events.

'hot news,' that is, information that must be printed immediately or it will lose its newsworthy value, actual malice may be inferred when the investigation for a story was grossly inadequate in the circumstances." Lake Park Post, Inc. v. Farmer, 590 S.E.2d 254, 260 (Ga. Ct. App. 2003) (quoting News Publ'g Co. v. DeBerry, 321 S.E.2d 112, 114 (Ga. Ct. App. 1984)).  Plaintiff has not shown that a jury question exists as to whether Defendants' investigation was "grossly inadequate."  As discussed previously, Davis spent considerable time gathering information and sources for the First Article; he spoke with twenty individuals and only relied on those sources who he considered to be credible.  Some of the facts on which Plaintiff relies to suggest that the investigation was inadequate—that Davis waited to publish anything until he had sufficient credible accounts and until the women agreed to come forward their stories—in fact tend to show that Davis took the research and investigation process seriously.  Cf. Stange v. Cox Enters., Inc., 440 S.E.2d 503, 506 (Ga. Ct. App. 1994) ("While a failure to investigate alone does not establish malice, the investigation which [the writer] undertook tends to corroborate his assertion of good faith and belief in the truth of the published statements.").  To the extent that Plaintiff makes an argument on this basis, the record does not support a conclusion that Davis's investigation was "grossly inadequate" such that actual malice may be inferred.

Finally, Plaintiff suggests that Davis was trying to "serve his agenda" by publishing the articles and that, in essence, Davis's motives were suspect. [Doc. 111, p. 15]. This assertion misapprehends the actual malice standard. Plaintiff's contentions about Davis's motives amount to a general allegation that Davis wanted to malign Plaintiff rather than publish a newsworthy story. However, "unsupported inferences or conjecture regarding a defendant's motivation do not suffice to show malice." Torrance, 656 S.E.2d at 156 (quoting Smith v. Henry, 625 S.E.2d 93, 96 (Ga. Ct. App. 2005)). Second, even if the record did show that Davis was motivated by ill will toward Plaintiff, actual malice requires more than animosity. See, e.g., Ladner, 806 S.E.2d at 916 (finding no actual malice despite the plaintiff's assertion that "the strong language [the reporter] employed in reporting the story . . . reflected the reporter's ill will toward him"). Indeed, "'imposing liability on the basis of the defendant's hatred, spite, ill will or desire to injure is clearly impermissible.'" Bollea v. World Championship Wrestling, 610 S.E.2d 92, 97 (Ga. Ct. App. 2005) (quoting Dworkin v. Hustler Mag., Inc., 867 F.2d 1188, 1195 (9th Cir. 1989)); see also Miller, 349 S.E.2d at 507 ("Constitutional malice does not involve the motives of the publisher but is based upon his awareness of actual or probable falsity or his reckless disregard for

71

possible falsity.").  Therefore, Plaintiff's claims about Davis's motives do not suffice to show actual malice.

A defamation plaintiff must establish all four elements of the claim. StopLoss Specialists, LLC v. VeriClaim, Inc., 340 F. Supp. 3d 1334, 1346 (N.D. Ga. 2018).  Plaintiff has failed to show that a triable issue of fact exists on the question of actual malice, the third element.  Accordingly, summary judgment is **GRANTED** to Defendants on the claim for defamation and defamation per se.[20]

### B.   False Light Invasion of Privacy and Public Disclosure of Private Facts

A plaintiff bringing a claim for false light invasion of privacy "'must show the existence of false publicity that depicts the plaintiff as something or someone which he is not.  Next, the plaintiff must demonstrate that the false light in which he was placed would be highly offensive to a reasonable person.'"  Williams v. Cobb Cnty. Farm Bureau, Inc., 718 S.E.2d 540, 543 (Ga. Ct. App. 2011) (quoting Blakey v. Victory Equip. Sales, Inc., 576 S.E.2d 288, 292 (Ga. Ct. App. 2002)). Importantly, "to survive as a separate cause of action, a false light claim must allege a nondefamatory statement.  If the statements alleged are defamatory, the claim would be for defamation only, not false light invasion of privacy."  Bollea,

---

[20] In light of this finding, the Court does not address Defendants' argument that the statements at issue are conditionally privileged.

610 S.E.2d at 96 n.1.  As to public disclosure of private facts, this claim has three

elements:

> "(a) the disclosure of private facts must be a public disclosure;
> (b) the facts disclosed to the public must be private, secluded or
> secret facts and not public ones; [and] (c) the matter made
> public must be offensive and objectionable to a reasonable man
> of ordinary sensibilities under the circumstances."

Dep't of Lab. v. McConnell, 828 S.E.2d 352, 359 (Ga. 2019) (alteration in

original) (quoting Cottrell, 788 S.E.2d at 786).

Defendants' only ground for seeking summary judgment on the claims for

false light invasion of privacy and public disclosure of private facts is that

Plaintiff's inability to prove defamation necessarily means that these claims fail,

too.  [Doc. 110-1, p. 32].  Defendants contend that these claims are merely

defamation claims under alternative labels.  In the absence of other argument by

Defendants, the Court cannot hold that Defendants are entitled to judgment as a

matter of law on these claims.

## V.    CONCLUSION

The Motion for Summary Judgment [Doc. 110] is **GRANTED IN PART**

**AND DENIED IN PART**.  Summary judgment is **GRANTED** to Defendants on

the claims for defamation, defamation per se and tortious interference with

business relations.  Summary judgment is **DENIED** on the claims for false light

invasion of privacy and public disclosure of private facts.  The Motion for Oral

Argument [Doc. 113] is **DENIED**.

Because the dispositive motions have been decided and discovery is closed,

the Court **ORDERS** the case to mediation.  The parties may retain a private

mediator at their own expense or ask this Court to appoint a United States

Magistrate Judge to conduct the mediation.  The parties are not required to pay for

mediation by a Magistrate Judge.  No later than April 4, 2023, the parties must

advise the Court of their mediation preference.  The parties shall have through and

including May 19, 2023, to complete the mediation.

In light of the upcoming mediation, the Clerk is **DIRECTED** to

**ADMINISTRATIVELY CLOSE** this case for docket management

purposes.  Administrative closure will not prejudice the rights of the parties to this

litigation in any manner nor preclude the filing of documents.  Within five days

after the mediation, the parties shall notify the Court as to whether mediation was

successful.  If mediation fails to result in a settlement, the Court intends to set this

matter for trial on June 12, 2023.

**SO ORDERED** this 21st day of March, 2023.

J. P. BOULEE
United States District Judge